**Pages 1 - 34**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

| | | |
|---|---|---|
| JOEL SCHWARZ, et al., Plaintiffs, | ) | |
| VS. | ) | NO. C 25-03125 RS |
| GOOGLE LLC, Defendant. | ) | |

San Francisco, California
Thursday, October 23, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

EDTECH LAW CENTER PLLC
P.O. Box 300488
Austin, Texas 78705
**BY: JULIE U. LIDDELL, ESQ.**

For Defendant:

PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, California 94105
**BY: SUNITA BALI, ESQ.**
**JAMESON ULLMAN, ESQ.**

PERKINS COIE LLP
Commercial Litigation
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
**BY: ANNA MOUW THOMPSON, ESQ.**

Reported By: James C. Pence-Aviles, RMR, CRR, CSR No. 13059
Official Court Reporter

Thursday - October 23, 2025 1:47 p.m.

P R O C E E D I N G S

---000---

**THE CLERK:** The next matter we are calling is 25-CV-3125, Schwarz versus Google.

Ms. Liddell, why don't you come up to the podium since we have a remote court reporter.

**MS. LIDDELL:** I'm so sorry. Could you say that again?

**THE CLERK:** I just need you to come up to the podium because we have a remote court reporter that can see you. So I just need to have you --

**MS. LIDDELL:** Okay. Sure. You bet.

**THE CLERK:** -- stand at this side when speaking.

**MS. LIDDELL:** I will.

**THE CLERK:** Okay. Yeah. So -- okay.

So appearances, please, first starting with the plaintiff and then the defendant.

**MS. LIDDELL:** Good afternoon, Your Honor. Julie Liddell for the plaintiffs.

**THE COURT:** Good afternoon.

**MS. BALI:** Good afternoon, Your Honor. Sunita Bali, of Perkins Coie, for Defendant Google. And I also have my colleagues Anna Thompson and Jameson Ullman, also from Perkins Coie, for defendant.

**THE COURT:** Good afternoon.

So this is a putative class action, and we're here on the motion to dismiss the complaint. Let me just start off -- or let's start off to talk first about the claims -- I think there are nine claims for relief. The first two are 1983 claims.

So, Ms. Liddell, I'm having some trouble understanding why 1983 would be implicated here because you do need a state actor, and I don't think you have one. So tell me why I'm wrong about that.

**MS. LIDDELL:** Yes, Your Honor.

So I certainly understand that the law is very clear that just having a contract with a state entity does not confer status of state actor.

And if all we had here was a school -- a vendor had a contract with schools to, you know, sell desks or even floppy disks, something that was entirely within the school's control -- that essentially, once the vendor handed over that product, its -- its influence over -- in this case, education -- would cease.

And that's not what we have here with Google products. As of 2025, and especially post-COVID, learning is done almost entirely digitally. And where schools use Google products, Google owns and operates the information and learning environment in which children work, collaborate, learn, think, store their information.

And so I think if we have a scenario where schools -- let

me -- let me maybe put it this way. If teachers were doing what school -- what -- what Google is doing, namely surveilling children all day while they're at school and -- and even at their -- when they're at home on their devices and logging every single thing that they're doing, not just, you know, the -- the first-party data user-submitted/created content but also the -- the metadata, how the -- how quickly they're doing it, how much they shift between activities, all of this information that, in the Data Age, allows companies to create these very robust behavioral profiles on kids, I don't think we would have any trouble saying that was a problem -- that was a constitutional problem, and yet that's -- that's exactly what Google is doing here.

**THE COURT:** I -- the ubiquitous nature of your characterization of the defendant's role here may be true, but I don't think that answers the state actor question. You know, I -- I think everything you've said could be accepted, and one would still find that there's something missing for a 1983 case.

**MS. LIDDELL:** So sure -- oh.

**THE COURT:** I have to candidly tell you, I just don't see this as a 1983 case.

**MS. LIDDELL:** So in the -- in sort of the language of 1983, looking at it through, essentially, what our arguments are -- are that Google is either performing a public function

or that their provision of services is so entwined with schools as to be inseparable from school action.

And in terms of a public function, again, we have the fact that this is a -- it would be different maybe if we were talking about a company that provided a single app that did some -- that offered some kind of gamified learning program. That's not what we're talking about here.

What we're talking about is a company that controls -- not only provides the services for but has a considerable degree of control over, again, the learning environment of kids.

**THE COURT:** What is the -- and not to -- and I don't want to spend too much time on these two claims, but the public function, again, is what?

**MS. LIDDELL:** The public function is where the -- the private entity is performing a function for the state that has been traditionally and exclusively provided --

**THE COURT:** What is that here?

**MS. LIDDELL:** And so here, that would be access to course materials, assignments, availability of information, storage of files, manage link -- managing of --

**THE COURT:** Would that be any different than any vendor a school district would utilize? They're not all state actors.

I mean, you know, you're saying, "Well, in the digital world, it's all-encompassing, what the school districts are

looking for and where they go to get whatever they get." That doesn't mean that -- that a publishing house that does course materials becomes a state actor.

So I'm having trouble with --

**MS. LIDDELL:** Well, again, that would essentially mean that in -- today, when schools are primarily digital -- that by schools offloading/outsourcing basic school functions like those I've described through a private party, that's -- that's a massive infringement than -- of children's constitutional rights.

Things that, if -- if they were done by the schools themselves, would be unconstitutional have now been outsourced to private companies. And I don't think that the law says that children should lose their constitutional rights just by virtue of that new 21st century arrangement.

**THE COURT:** Well, again, you know, the problem -- you were saying that constitutional rights are implicated. That doesn't necessarily answer the question of who is the actor in this. And, you know, a private entity could impact your -- your speech, and that way, they wouldn't become a state actor for that reason.

So, anyway, why don't -- why don't we stop on -- on this, and I'll ask Ms. Bali to comment on that, and let's move on to the other claims.

**MS. BALI:** Yeah.

I'll just say briefly Google doesn't own and operate the learning environment. Google is just -- Google provides educational services that schools choose to use or not. I mean, they -- you know, I don't think it's as ubiquitous as -- as Ms. Liddell claims.

But in any event, you know, they contract with schools that choose to use their services, and Google provides those services to the school to use however they'd like in the educational setting.

So it's not -- they are a vendor. That's -- that's -- that's the nature of the relationship.

**THE COURT:** Let's move on to some of the other claims here.

The -- well, why don't I just come back to you, Ms. Liddell. You can -- focusing now on the non-1983 claims -- well, let me -- actually, let me go first back to Ms. Bali. You're the moving party.

**MS. BALI:** Yes.

**THE COURT:** So why don't you tell me, on the non-1983 claims, why you think they should be dismissed.

**MS. BALI:** Yes. Thank you, Your Honor.

Well, first, I'll start -- there's a lot to address in this complaint and a lot of claims, but I'll start by focusing the Court on two issues.

First and foremost, I think plaintiffs haven't satisfied

Rule 8. And I know that it's a low bar, but plaintiffs' complaint just does not include a short and plain statement of the claims showing that the pleader, these particular plaintiffs, are entitled to relief under any legal theory.

It's -- the complaint's long, and there's a lot there to unpack, but it consists largely of broad-based attacks on Google's business model and --

**THE COURT:** The principal argument --

**MS. BALI:** Yes.

**THE COURT:** -- you seem to have in this argument --

**MS. BALI:** Yes.

**THE COURT:** -- is to say they need to be more specific about the particular Google products that are involved, but is that really true?

I mean, they have identified various systems and -- Chrome and Chrome products and the like, and the point of Rule 8 is to make sure that you are alerted to the nature of what they're contending. You -- you are put on notice that this family of products is what they are talking about. For Rule 8 purposes, isn't that enough?

**MS. BALI:** I don't think so, Your Honor, because -- for a number of reasons.

First thing, the family of products is a lot of products. Even just with respect to Google Workspace for education, and even just with respect to Core Services, there's nearly 30

different services.

So at -- at a minimum, I think that plaintiffs should be required to allege which one of those services they use. Did they use Google Docs? Did they use Gmail? Did they use Google Drive? I mean, what are the products and services that they use?

And the reason why that matters is because that implicates the data that they contend Google collected about them; right? This case is a privacy case. They're alleging that Google collected data that they should- -- that they shouldn't have, that Google improperly used data and disclosed it to third parties.

**THE COURT:** Well, isn't their argument, though, that across -- across that whole universe of products -- that you didn't get the proper consent?

So I understand you say, "We did," and that's a whole different issue. But the -- is it -- is it product-specific, for purposes of their argument, that -- pick any one of these -- you didn't get proper consent?

**MS. BALI:** Well, I think it is because there's still a question of whether Google collected the data in the first place; right?

Like, the consent is only required if Google collects the data. What data do they think Google collected about them? It's not clear, and that's really important for purposes of,

for example, a Federal Wiretap Act claim -- what did Google intercept? -- the same thing under CIPA.

So when you start looking at the elements of the specific claims, I think it requires that they plead facts showing what data was collected about them, how they contend that data was used, and to whom and how they contend that data was disclosed. And there's just no facts about that at all in the complaint, and I think they've got to do more to state a claim under any of these legal theories.

And the -- the point Your Honor made about the consent issue takes me to my second sort of threshold argument, which is COPPA. I think their state law claims are preempted -- are preempted by COPPA, and I can pause there unless the Court --

**THE COURT:** No. Go ahead.

**MS. BALI:** Okay. So, you know, COPPA includes an express preemption provision. It prohibits state law claims to the extent they purport to require conduct that's inconsistent with COPPA. I don't think there's any disagreement that the conduct alleged here is regulated by COPPA.

So the only remaining question is whether the plaintiff -- plaintiffs' state law claims seek to impose requirements that are inconsistent with COPPA, and I think they do. And the crux of plaintiffs' theory is that the consent that Google obtains from schools isn't good enough, that Google is required to go directly to parents and obtain consent directly from parents.

But that's not what COPPA requires. The FTC --

**THE COURT:** Then we get into this whole business about, you know, reasonable efforts to get consent. Then you say -- and I don't know if we're already beyond the pleadings, but the FTC provides some guidance as to -- that I guess supports your notion you get it from schools.

But, you know, then we're into the -- what deference do we give to the FTC? And we know it's not *Chevron* deference anymore. So then we're into *Skidmore* deference and all of that. Is -- is that -- at that point, are we really in a position that you can call a question on a pleading motion?

**MS. BALI:** I --

**THE COURT:** Maybe on a summary judgment motion, but is it -- can I -- can I really conclude that, as a matter of law -- and when the language is, "What are reasonable efforts to get consent?" and the FTC is saying, "Well, we think that that means if you go to the schools and the schools say, 'Okay,' that's enough," that -- that seems to be pretty much -- doesn't seem to be -- well, as a matter of law, it's clear.

**MS. BALI:** Well, I think, you know, we have a decision that really dealt with squarely this issue, and it's the *New Mexico v. Google* case where the court con- --

**THE COURT:** It was a District Court case.

**MS. BALI:** It's a District Court case. It's not binding.

**THE COURT:** Well, a District Court case -- maybe it's very persuasive, but it's a District Court case.

**MS. BALI:** It's -- it's --

**THE COURT:** So it doesn't control anything here.

**MS. BALI:** I understand. It's not binding on this Court, and, of course, this Court will do its own analysis, but I do think the analysis set forth in that decision is very persuasive.

I mean, the court recognized that the FTC, which, you know, COPPA charged with coming up with the -- the rules under the -- you know, rules for implementing COPPA -- the FTC developed the rule -- the COPPA rule.

And the FTC has said, both in the statement of basis and purpose of the COPPA rule and in subsequent pieces of guidance for the last, you know, several decades, that operators can obtain consent from schools in the educational context when the data is only being used for educational purposes and not for any commercial purpose.

And Google's terms were clear that that's exactly the case with respect to Core Services. I don't think plaintiffs allege any facts -- maybe there's conclusions in their complaint, but there's certainly no facts suggesting that any of this information is used for commercial purposes. And so there's really no factual disputes that need to be resolved, or at least they haven't introduced any by way of their allegations.

So, you know, I think Google has complied with FTC guidance, and it publishes a privacy notice that lays out all of their data practices, as is required by COPPA, and it obtains consent from schools in its terms before it -- you know, with respect to all of its data practices.

So, you know -- and I'm -- again, there's no private right of action under COPPA. So this isn't a question of whether Google complies with COPPA. I'm sure if there was an issue there, the FTC would be all over it. That's their job.

But this is a preemption question, and I don't think there's any dispute that -- or I don't think there -- there should be a dispute that what they are proposing, this direct consent from parents approach, is not a framework that -- that is supported by the requirements of COPPA. COPPA requires something else.

So they are seeking to use state law claims as a workaround to require a consent structure that is different than what COPPA allows.

**THE COURT:** Now, you have various arguments in the event that you don't prevail on the preemption argument. You've got specific arguments with respect to some of the state law claims that are in here.

**MS. BALI:** Yes.

**THE COURT:** Anything you want to highlight for me?

**MS. BALI:** Oh, there's so much, Your Honor. If

there's any burning questions that you have, please let me know.

I'll say -- you know, I briefly touched on the, you know, Wiretap Act and CIPA claims. I know the Wiretap Act is a federal statute, but CIPA is the analogue. And, again, there's just no -- there's just no facts to support a CIPA violation here, and I think that that's really a theme that carries through all of their claims, you know, same with the CDAFA claim.

There's just no facts alleging, you know, that Google did anything without permission. We're talking about Google's own systems, same with -- with, you know, the -- the damages claim, which I think touch -- you know, kind of crosses over between both CDAFA and the UCL. Where's the economic harm? There's no standing. There's no standing, under CDAFA, for the same reason.

And I think that -- maybe I -- maybe I touched on all the state law claims, but --

**THE COURT:** Okay.

**MS. BALI:** -- there's so much there, Your Honor. If there's any questions you have, I'm happy to address them.

**THE COURT:** You've briefed it fully.

I spent four weeks in trial recently on Google's privacy policies. So --

**MS. BALI:** Oof.

**THE COURT:** -- I --

**MS. BALI:** Well, you know them.

**THE COURT:** I'm familiar with some of them.

**MS. BALI:** Nice to hear. I have some --

(Laughter.)

**THE COURT:** So let me go back to you, then, Ms. Liddell, and you can respond both on the preemption issue, the other issues, whatever you want to highlight for me.

**MS. LIDDELL:** Sure. Thanks, Your Honor.

So on Rule 8, we think that defense counsel is asking for us to plead way more than Rule 8 requires. And the body of data privacy law makes clear that you don't, for purposes of Rule 8, have to allege with great specificity the types of personal and private data that are collected, that essentially categories --

**THE COURT:** So could you plead, with respect to the representative plaintiffs, what -- you know, which of these Google products that they used and --

**MS. LIDDELL:** Right.

And so we don't think that's necessary. We allege --

**THE COURT:** But could you -- were you -- would you be able to do it?

**MS. LIDDELL:** If we could -- I don't know. I'm not sure of that. It's possible that children would necessarily remember which individual products within Core Services they

used, but more importantly is we don't need to. There --

**THE COURT:** Well, here, the plaintiffs are the guardians, the -- the parents.

**MS. LIDDELL:** Sure.

Either way, parents don't know. They're not at school with kids, and a lot of times, they don't even know they're using Google products. And so you're relying, essentially, on what the kids can remember about what they used, which is a whole other problem.

But essentially, if it was the case that Google's data practices vary -- varied wildly or at all between individual apps, that there is some sort of bespoke data practice for each app, we would assume they would set that out in their terms of service and privacy policies, and they don't.

**THE COURT:** How can they, on a very -- very basic level -- if it's as general as, "These are the products that the" -- "family of products that the school district is utilizing," how do we know if -- I mean, one can maybe infer that the -- the representative plaintiffs' children or the -- those for whom they're guardians, you know, used these products.

But don't we need something more specific? I mean, who knows? A kid might just sit there and not look at anything. I mean, there's got to be some allegation of use.

**MS. LIDDELL:** Even if you turn it on, it's collecting

information. I mean, as you said, you just know -- you spent four weeks steeped in Google's privacy policies, and you understand it is impossible to use any of Google's products without it collecting vast troves of -- of user data.

And so -- and also, we don't think it's the case that these kids were just going -- sitting and --

**THE COURT:** Well, they were --

**MS. LIDDELL:** They were using -- they were using Chromebooks and Chrome -- the Chrome browser and Google apps.

And I think that's a really -- the fact that -- again, what the policies don't make clear, especially within Workspace for Education, is the centrality of the ChromeOS and Chrome browser doing the functionality of everything, of the Core Services, of the Chromebook itself -- that it's literally not possible to use these products without -- the Chrome browser isn't an app. It is the -- it is the fundamental interface of Chromebooks and ChromeOS.

And so it is -- it is literally not -- I mean, the -- the notion -- the argument that these students could be using Chromebooks for school day in, day out, and that Google is not collecting sensitive information about them -- it's not a serious argument.

It's belied by their -- their own admissions, their own terms of service and privacy policies about how their products work, that it's -- it's literally not possible to -- to -- for

these products to even exist, let alone function, without the collection of that data.

**THE COURT:** Let's, then, just move to the preemption question.

**MS. LIDDELL:** Sure.

So --

**THE COURT:** Tell me why they're wrong about -- about COPPA and the CIPA issues.

**MS. LIDDELL:** So there's -- there's a -- there's a lot there kind of scattered over these briefs, and I would say that there is a lot of stuff in their reply that they didn't raise in their initial motion, but -- but it doesn't matter. Even assuming that we can consider all the new law that they say preempts all state law, it doesn't get them where they want to be.

I mean, just at a very high level, what -- their theory of consent, as best as I can understand it, is that they concede that they're not getting consent from parents. They're getting consent from schools, and schools alone, as a third-party agent of parents --

**THE COURT:** And --

**MS. LIDDELL:** -- but they're not alleging --

**THE COURT:** And they're saying that the FTC says --

**MS. LIDDELL:** Right.

So they're not saying common-law agency, where you would

have a parent that agrees and says, "You bet. You sign us up for any data profiling practices that you see fit." They're saying that their agents, as a matter of law, under COPPA -- and so just -- not COPPA -- it's a hodgepodge of FTC guidance in the form of FAQs, blog posts, privacy statements, and that -- all of that sort of constellation of informal, nonbinding guidance preempts all state law and all state definitions of what "consent" means such that it creates a blanket defense to all state claims.

It just doesn't pass the smell past. As a matter of law, it doesn't pass the smell test.

**THE COURT:** Your argument is -- I just want to make sure I understand your argument -- because of the -- of the characterization you've just given of what the FTC has opined about and the form of it and the like -- that that doesn't rise to the level of an agency determination or, if it is one, it doesn't get *Skidmore* deference because it's kind of fractured and -- I mean -- and I'm trying to get my --

**MS. LIDDELL:** Uh-huh.

**THE COURT:** -- hands around what exactly the -- the reason you say, "It doesn't matter what the FTC said in this instance."

**MS. LIDDELL:** And I think that's a good -- or an important point to make is that I'm not here on behalf of the FTC, and I'm not here on a COPPA enforce- -- enforcement

action.

If I was, their arguments might have more salience. That might be more relevant if I'm here saying, "They didn't do this," and they could come back and say, "But you" -- "but you said we didn't have to." That's not what we're here on. I'm here on a whole bunch of claims that -- that aren't COPPA.

And so the notion, again, that this -- this kind of just patchwork of informal guidance preempts state law -- there's just -- there's no base -- I mean, start with the text of the statute, and that not only isn't supported by the text. It's directly undermined by the text, which is very clear about verifying that parent -- parental consent is required, "And here are the exceptions."

They -- they enumerate them. It's not even they're silent on exceptions or it says exceptions as the FT- -- FTC may see fit and promulgate by blog posts. It says, "Here are the exceptions," and they're very few and very limited, and it's basically exceptions necessary to procure parental consent.

Again, we don't have an absence of evidence about congressional intent on this issue. The pre- -- very preamble, the statement of basis and purpose of that vague cite that they relay -- rely on makes clear. Congress was presented with this exception. There was a big lobbying effort to push through this exception, and Congress said, "No."

And so what they're relying on -- one of the things that

they're relying on is a single sentence of this 200-page statement of basis and purpose that essentially says you can presume that an agency exists between a school and a parent, which is -- it runs afoul of all traditional agency principles, not -- not to mention the text and purpose of COPPA itself.

And the FTC itself has said so twice now in the last year, as recently as eight weeks ago -- has said, "That is absolutely not what we meant by any of our guidance that we've promulgated over the years."

**THE COURT:** Let me just ask you: If -- under your theory, if they were -- "they" being Google -- were to not run afoul of these claims that you brought, what kind of consent would they need to have obtained for individual -- each parent or guardian would need to have --

**MS. LIDDELL:** Sure.

**THE COURT:** -- to consent? Is that what you think?

**MS. LIDDELL:** That -- yeah, I mean, the same consent that they would need to obtain for any of their other -- it's really the same products but just -- that aren't marketed to and used in the school setting.

So they already do this, I -- I think. They're supposed to already be doing this with respect to all of those products used in a noneducational setting. In fact, they make a distinction between these Core Services and then this other bucket of apps called additional services and say, "Okay. For

these Core Services that are dynamic" -- and the list is changing, and they don't actually identify what those are in the privacy policies.

"But for these things that we call Core Services" -- "Services, we're going to need to get parental consent. Schools, it's enough for you to consent. You" -- "you've got the authority to consent. But for these other apps that we call additional services, we actually do need parental consent for that. So we're going to need to work with you to make sure that we get consent for that."

So the notion that Google, in its many resources, and the fact that it already does this, couldn't get consent for all of the products in the same way that it does these additional products is just not -- it's not supported by the facts.

**THE COURT:** Okay. Let me go back to the Google side and -- any -- any response you want to give?

**MS. BALI:** Yeah. I mean, so many. So many.

**THE COURT:** Well --

**MS. BALI:** The -- I'll start by --

**THE COURT:** -- whittle it down for me.

**MS. BALI:** I'll start by saying that all that COPPA says is that the FTC is to promulgate a rule. You look at the rule.

And in the statement of basis and purpose, it says clearly multiple times that where an operator is authorized by a school

to collect personal information from children after providing notice and consent to the school of the operator's collection, use, and disclosure practices, the operator can presume that the school's authorization is based on the schools having obtained the parents' consent.

It says the rule does not preclude schools from acting as intermediaries between operators and parents in the notice and consent process or from serving as the parents' agent in the process.

And that's not the only place that addresses it. It addresses it again a little bit later, and it says the rule does not preclude schools from acting as intermediaries between operators and parents in the notice and consent process or from serving as the parents' agent in the process. Thus, the rule should not hinder businesses that provide services to schools.

When the FTC developed the COPPA rule, they are trying to balance both the need to protect children's private data in the context of -- of the online environment and also the -- the need to not burden companies with, you know, consent requirements that can't be met.

Google doesn't have a direct relationship with the parents of these children. Google provides this service to the schools. So if a school decides that they want to contract with Google for a Workspace for Education offering, Google provides that service, and the school decides to then

distribute individual accounts to its students, its teachers, which of the services they want students to be able to access.

It's -- it -- plaintiffs want to ignore the role of the school, but they can -- these are educational products that are only used in the context of a school environment.

And the FTC's guidance is not a hodgepodge. It's consistent. From the time that the COPPA rule was first promulgated all the way to the present, they have taken the same stance with respect to the consent that is required in the educational context. There is no back-and-forth on that.

**THE COURT:** Okay. But if -- I mean, when you are pointing to things like a response to frequently asked questions --

**MS. BALI:** Yes.

**THE COURT:** -- by the agency, that doesn't connote to me a -- a definitive agency -- final agency action. I mean, that's a pretty loose type of interaction on which to say this is the agency's considered determination on which you could presumably find preemption.

**MS. BALI:** Yeah.

I think -- well, it's not just an FAQ.

**THE COURT:** Oh, I understand your -- that's one of the various FTC things, but that's why it's not -- it's not a nice, clean agency determination that either rises or falls. It's a collection of things, isn't it?

**MS. BALI:** Well, I don't think we can point to a single document. I -- I think it's a series of documents which -- you know, all the way from the statement of basis and purpose in the rule itself, all the way through -- to the way that -- to the guidance that they've provided both in the FAQ, also known as the compliance guide, which is, you know, an important reference for companies that are attempting to comply -- you know, that are -- are trying to come up with a compliance system with respect to COPPA, as well as statements they have made subsequently, as well as the way that they've enforced COPPA against ed tech providers. It's been consistent and clear from start to finish.

So I don't think there's any question about, you know, the FTC's stance on -- on, you know, consent in schools. And to be clear, it -- it -- for a company to rely on consent from a school, the data has to be collected and used for the benefit of the school, and the company also has to have a privacy notice that complies with COPPA.

So they have to give notice to the school so that the schools can provide consent in an informed fashion, and they have to -- you know, they can't use the data for commercial purposes. And so, you know, it makes a lot of sense in the con- -- in the context of figuring out how to incorporate technologies in schools; right?

I mean, you know, Google -- again, Google does not have a

direct relationship with parents. Like, imagine -- how is that going to work? How is Google going to go about obtaining direct consent from parents in the context of a school environment? If the school chooses to use these services, it is reasonable to allow the school to provide the consent to the use of those services in -- in the collection of data in connection with those services.

**THE COURT:** Going back for a moment to the Rule 8 issues, there's some suggestion in -- in the papers that, well, to the extent that the plaintiffs have not identified the particular Google product or whatever -- that that information really is information you have and not what they have.

And to some extent, you know, the suggestion that, "Well, we need to know which products they're using," the response is that, "You know that very well because you're the holder of the information." We all know you can't bring a case and use it as an opportunity to fish around to try to find something. I understand that law. So you don't have to tell me that.

But, you know, isn't there something to the argument that, when you say, "Well, we really don't know what they're talking about here," you do know? It's just, you know, they haven't been in a position to aver it in -- in the specific terms that you've said they should.

**MS. BALI:** Well, okay. I will say a couple of things in response to that.

One is, if they're going to file a lawsuit, they've got to have a factual basis under Rule 11. What is the factual basis?

**THE COURT:** Right.

**MS. BALI:** Are you -- are you -- you know, what products and services did you use, and what data was collected about you -- about you, plaintiff? And there's nothing like that in the complaint.

**THE COURT:** There are cases, though -- and you know them well, too, I'm sure -- that say -- that embrace that concept but, at the same time, say there are those cases where information is uniquely within the province of the -- of the defendant and that it's -- it's not, you know, open season on the dreaded fishing expedition.

But it is something that can be taken into account if it is uniquely information that is under the control of the defendant and that the plaintiff would not, even using reasonable efforts, be able to get access to. You can tell me that is not this case.

**MS. BALI:** That is not.

**THE COURT:** I'm just -- okay.

**MS. BALI:** I understand that there is that law out there. That is not this case, and -- and --

**THE COURT:** And that's because?

**MS. BALI:** And that's because, first thing, they don't even allege what schools they attended. So we don't even have

that base-level information.

Okay. Second thing, you know, I just don't think it's credible to say that they don't even know what services they use. You know if you're sending emails on Gmail. You know if you're storing documents in Google Drive. You know if you're using Google Classroom.

They have to be able to do better than nothing, and that's what's in the complaint, nothing.

**THE COURT:** Was it their obligation, say, to go to the school districts to find out from the school districts what products are being used?

**MS. BALI:** Well, it's their obligation to come up with facts to plead -- that show that they have a good-faith basis for a claim under Rule 11. They have not done that.

And that is exactly what this would turn into, is a scenario where they're set -- you know, looking to learn via discovery facts to support claims that are not sufficiently pled, and that's not how this works.

They've got to plead facts to get over a -- the pleading threshold before, you know, we should have to engage in extensive discovery, which is presumably what they're -- what -- their approach to finding out facts to plead, and that's just backwards. That's backwards.

**THE COURT:** Final comments, Ms. Liddell?

**MS. LIDDELL:** Highly relevant under Rule 8, the fact

that there is this gross asymmetry of information, Number 1, that only Google possesses.

And as we've pled in the complaint, we did try to go to the schools and get that information, and they either wouldn't or couldn't provide it to us. But that's beside the point because it's not schools' burden. It's -- it's -- as much as Google will protest, it is Google's burden.

It is not entitled to foist all of its obligations, under this big federal privacy law, to schools just by marketing into schools.

**THE COURT:** How about the point that, in the 77-page complaint, there isn't -- there isn't even an identification of where the -- what schools the -- the class representatives' children attended?

**MS. LIDDELL:** It does --

**THE COURT:** Would that be in there?

**MS. LIDDELL:** It doesn't matter. Number 1, we left that out to -- this is a privacy case and --

**THE COURT:** Well, you don't have to identify the -- the --

**MS. LIDDELL:** But more to the point, it's -- it doesn't matter because our position is not -- again, these are not bespoke contracts between school districts and Google. It's not as though Google was sending a contract, and a school district would redline it and send it back.

These are all just contracts of adhesion. It's, "Take it or leave it." And so our position is it doesn't matter which district you're talking about. Its practices are uniform across its products across all districts.

**THE COURT:** Is it your averment that every school district uses every Google product?

**MS. LIDDELL:** The Google -- well, we're not trying to represent every district.

**THE COURT:** Okay. No. I'm talking about the districts which are implicated in --

**MS. LIDDELL:** We're only trying to represent the districts that use the products that we have said. It's Chromebooks, Chrome browser, and the Core Services.

**THE COURT:** Okay. And are the class representatives' charges, the -- the minors -- are they in the school districts that use all those products?

**MS. LIDDELL:** Yes --

**THE COURT:** The -- okay.

**MS. LIDDELL:** -- but -- and I would also add that, again, the concept that our complaint is just devoid of allegations is just false.

Number 1, we do allege which products they use to the level that's required, and nothing in Google's disclosures make -- they don't define with greater granularity beyond Core Services.

And so we do allege, based on -- again, based on our use of the products, Google's own disclosures -- we did ask Gemini, which is Google's, you know, AI model that's leading the way in information and is being forced into all K-through-12 products. We performed forensic testing on the -- on the individuals' products, which did show that lots and lots of metadata was being hoovered up during those sessions.

We have -- and just to name a few categories, it's -- it's account information, name, email, password that's necessarily created every single time a child has a Google account. It's activity while they're using the Core Services, content viewed/created, location information, communications, assignments, essays, emails, other communications, photos, videos. We allege all of that.

And -- and cases on this issue are clear that you don't have to allege, again, with that level of granularity. I think they say what distinguishes this from *Cherkin* is that, in *Cherkin*, we had an allegation that it was a political essay and sensitive voice recordings, and that was irrelevant. That was not anything that Judge Donato cited in his order as -- well, that's -- that -- that allegation is the difference between this being a defective complaint versus not.

And so then, of course, we have all the technical information that's generated every time anyone, including children, use their products. It's the metadata that is the

gold of -- of the data economy, information about their device, operating system, browser/network information, settings, interactions with third-party apps, browsers, device, unique identifiers.

You simply -- you simply can't overstate the amount of information that's being collected with any level of interaction with these products. And, of course, what we have is the tension between Rule 8, which requires a short, plain statement in these massive, complex, dynamic data -- data systems that don't readily lend themselves to a short, plain statement.

**THE COURT:** The -- your counterpart has focused a lot on Judge Blumenfeld's decision in *Hernandez-Silva*. And, you know, another District Court opinion is only as good as its persuasive value. We all know that.

But are they correct that that -- that -- is your argument, with respect to Judge Blumenfeld's opinion -- is he just got it wrong?

**MS. LIDDELL:** Yes.

**THE COURT:** You're not saying that it's somehow different than our situation?

**MS. LIDDELL:** No. We -- and that's why we requested dismissal with prejudice, so that we can take that up to the Ninth Circuit, so confident are we that our allegations in that complaint, as they are here, are sufficient when they're based

on the company's own admissions about how their products work. That has to be sufficient for -- to support allegations that that is how their products work.

**THE COURT:** Okay. Very well.

I'll take the matter under submission, and I'll give you an order.

I take it that, in the event I do determine that -- were I to determine that part or all of the motion should be granted, are you requesting leave to amend?

**MS. LIDDELL:** Could I see the order first before I commit?

**THE COURT:** I just want to make -- you know, I want to know -- sometimes, as you know, in this circuit, if you don't ask for leave to amend, you're out.

So I just want to know --

**MS. LIDDELL:** I think you have in our response that we do request leave to amend --

**THE COURT:** Okay.

**MS. LIDDELL:** -- but I -- I would like to consult my team and my clients.

**THE COURT:** Well, I don't think that -- that doesn't preclude you from, upon reading any order, deciding, "We'll stand on our complaint," like apparently you did in front of Judge Blumenfeld.

What I'm just asking you is whether or not you receive --

you're requesting that, barring a decision to the contrary -- that you would like to have leave to amend. It's to protect you. If you say, "No," that's fine.

**MS. LIDDELL:** And --

**THE COURT:** But then, you know --

**MS. LIDDELL:** Yeah.

**THE COURT:** And --

**MS. LIDDELL:** And to be clear, I did not say that at the hearing. He asked me that, and I said, "I'd" -- "I'd like some time to think about it, consult with my team and my clients."

And so we didn't give him that information until -- I mean, I think we took a week or something to -- to let him know whether we wanted to amend or just dismissal with prejudice.

**THE COURT:** All right. Very good.

I'll take the matter under submission.

**MS. BALI:** Thank you, Your Honor.

**MS. LIDDELL:** Thank you, Your Honor.

**THE CLERK:** Court stands in recess.

(Proceedings adjourned at 2:29 p.m.)

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Monday, November 10, 2025

James C. Pence-Aviles, RMR, CRR, CSR No. 13059
U.S. Court Reporter